SUCCESSION OF WM. W. TLRRIFF

VS.

P. J. MCMAHON & AL.,
APPELLANT.

No. 7691

April 5th, 1920.

The plaintiff did business under the name of "THE WOLVERINE SOAP COMPANY", of Portland, Michigan. This suit is brought against Ike Samuels, principal, and P. J. McMahon, and E. Samuels, Sureties, on the following bond:

"CONTRACT WITH SALESMAN"

This agreement made this Fifth day of December 1907 between "THE WOLVERINE SOAP COMPANY", of Portland, Michigan, U. S. A. hereinafter called the Company, and Mr. Ike Samuels of New Orleans, La., hereinafter called Salesman, witnesseth: That the said Company hereby appoints the above named person to be salesman for its soaps, perfumes, and other products. x x x The Company further agrees to furnish to the salesman said medicines, soaps, perfumes, and other products on board cars at Portland, Michigan, at such times and in such reasonable quantities as the said salesman may order during the life of this contract, reserving the right, however, to regulate or limit the amount of goods to be furnished, and agrees to charge such goods to him at regular wholesale prices to salesmen set forth in the printed confidential price list, or price lists, of the Company. x x x The salesman agrees to pay for all goods furnished him by said Company, as follows, namely: by remitting to the Company each week one-half of the cash produced by his business, unless otherwise directed by said Company, until his account shall be balanced. x x x The said salesman for his part further promises to per form faithfully, each and all of the agreements printed in the back of this contract. (The clause pertinent to this case printed upon the back is as follows: "To make regular and satisfactory weekly reports to th. Company").

In witness whereof the said parties have hereunto set their hands the day and year first above written.

"Signed" The Wolverine Soap Co.

by Wm. W. Terriff, President.

Ike Samuels, Salesman.

255

In consideration of the appointment of the above
named person as salesman, we hereby guarantee, jointly
and severally, the honest and faithful performance of
the said contract by him, waiving acceptance and all
notice, and agree that any extension of time, change
of territory, or reasonable modification of said con-
tract shall not release us from liability hereon.
"Signed" E. Samuels — *P. J. Mc Mahon*

P. J. McMahon Sureties are entitled upon request, at any time,
to full statement from our Report Register, showing condi-
tion of salesman's business".

Wm. W. Terriff died July 7th 1913; his succession was opened
in this Parish and an Executor appointed. In his petition the
Executor alleges that, in accordance with the above contract, the
plaintiff sold and delivered to Ike Samuels certain merchandise;
that on June 21st, 1913 the said Samuels made a written report
admitting an indebtedness to plaintiff of $1076.76; that on June
23d, 1913 he ordered more merchandise which was delivered to him
to the amount of $170.98; that on June 21st, 1913 he remitted
to plaintiff $25, thus leaving due to plaintiff $1222.74; that
Ike Samuels died in New Orleans on July 8th, 1913; that his
succession was opened, but was insolvent; that plaintiff received
from it, on account, $133.91, leaving a balance due of $1098.83,
for which he claims judgment against E. Samuels and P. J. McMahon,
Sureties.

E. Samuels failed to answer, and judgment by default was
taken against him.

McMahon filed a general denial, but admitted that he had
signed the bond sued on; further answering he averred: 1o that
at no time did the plaintiff ever advise him of the sale of the
goods by plaintiff to Samuels, and at no time did plaintiff ever
render any statement to him for any sums or money due by Samuels
for merchandise sold to said Samuels; 2o that plaintiff was
notified at one time that said Samuels was sick and weak and mental-
ly unbalanced, and that plaintiff should not trade with the said
Samuels, and that said Samuels was, to the knowledge of plaintiff,
for considerable time, confined in the sanitarium. Despite that,
plaintiff, so defendant is informed and believes, continued to

trade with said Samuels, but at no time notified ~~plaintiff~~ *defendant*
or called ~~plaintiff~~'s *defendants* attention to the condition of Samuels'
mind nor made any claim of any kind against defendants herein
with respect thereto."

There was judgment for plaintiff as prayed for, and
defendant, McMahon, alone has appealed.

1o The first defense is based upon the case of Lachman
& Jacobi vs Block, 47 A., 505; McMahon urges that plaintiff
had never notified him that they accepted his offer to become
a surety, or that, upon the faith of it, they had shipped or
would ship goods to Samuels. There is no article of the Civil
Code that makes it the duty of the creditor to give notice of
the acceptance of suretyship, or to give notice of credit ex-
tended. Unless such duty is clearly established by the juris-
prudence of our State we cannot impose it.

In the Lachman case the defendant Lazard, of New Orleans,
had written to the plaintiffs in San Francisco as follows:

"I agree to become surety to you for $10,000 for

Block Brothers",

with no intercourse whatever between the plaintiff and the surety
either before or after the letter. The Court held that the let-
ter of Lazard was merely an offer or pollicitation to become
surety, and was not binding upon the security until he had been
advised by the creditor that his offer had been accepted. Such
were the facts in 7 A., 385 (389). But in the present case the
document signed by *the* sureties was not a mere offer or pollicita-
tion, but an absolute bond creating immediately and absolutely
the obligation of a surety. The distinction is clearly estab-
lished in La. & W. R. Rd. vs Dillard, 51 A., 1484 (1490) wherein
it was said:

"Hence, the true doctrine is that a guaranty of a future
act, which is subject to a condition, must be formally
accepted, and notice of such acceptance given by the
guarantees; but it has no application to a contract
absolute in terms, as the one sued upon is." See also
Heitman vs Ry. Co., 136 La., 828, 829; 20 Cyc 1407;
106 La., 429; 140 La., 969 (975); 16 A., 19; 5 Ct. App.
169; 2 H. Dep. 1534, 1535; 11 La., 235; 7 Dalloz Rep.,
524 § 23.

X. The signature of the sureties having occurred upon the face
claims for the [contract] above the signature, acceptance and all
notice would seem to meet this objection. But conceding that
it does not.

2o The notice of the mental condition affecting Ike
Samuels, alleged by McMahon, is set forth as follows: A letter
of his father to the plaintiff dated April 17th, 1907, in which
he writes:

"I regret to inform you that the nervous condition of my
son Ike is such that if he continues as he is doing at pre-
sent he will be worse than he was last year. x x x Ike is
ambitious and don't want to commence at the foot of the
ladder, but he wants to get soap by the car load and have
this City to be the distributing center; but he is physi-
cally unable to do it; he could get the financial backing
providing his nervous conditions was in shape; if you desire
any further details I will give it. Therefore I suggest
that you would not encourage him to extend the business
for the present, but restrict him say 10 or 20 boxes weekly;
of course you want to be protected. I refer you to Teutonia
Bank concerning myself".

The plaintiffs by letter dated April 21, acknowledged the
father's letter of the 17th, and says that they felt friendly
to the son and would do nothing to impair his health; that they
would not encourage him to extend his business;"Neither would
they ship him any more goods, if they thought it would be a
damage to his health"; but they thought he would do better if
he was given a chance than if he met with opposition.

On April 25 the father answered the plaintiff:
"I thank you for yours of the 20th ult. of course I un-
derstand that you will continue to ship to my son soap on a
small scale; as I have stated in my last I will see that
you are protected, but I don't think this is required on
my part judging from the past business experience you had
with my son. If fortunately his nervous conditions im-
proves I will immediately advise you. Thanking you for the
interest you have taken in this matter &c".

On April 27 the plaintiffs again write to the father assur-
ing him that they will see that the son does business only on a
small scale until they are informed of a change for the better
in his physical condition.

The evidence shows that Ike Samuels did only a small

business. From June 5th, 1907 to June 27th, 1913, the plaintiffs shipped to him merchandise of the value of $11,045.10
On part payment of which he remitted <u>9,822.40</u>
leaving a balance due of $ 1,222.70

McMahon testified that he knew nothing of Samuels' mental or physical condition; if he had known that there was anything the matter with him he would not have signed the bond; that Ike Samuels asked him to sign the bond and not the plaintiff.

Maurice Feitel is an uncle of Ike Samuels; he knows that Ike Samuels was in a sanatarium for quite a while but he does not remember in what year; thinks he was there more than once; he wrote to the plaintiffs that Ike Samuels was not in his good sound mind and that they should not send him any more soap because he was not capable of attending to his business; that he was in a sanatarium and he thought it advisable for them not to ship him any more goods; he took a press copy of the letter, but his books were left in charge of a colored man who allowed goats to eat them up; so he could not find the copy; no one opposed the sort of business Ike Samuels was in; at different times Samuels used to come to him when there was soap at the depot, where he had to pay; it always came bill of lading sight draft attached, and a dozen times he came to him and got a check to take the soap out, so that he could go out and sell it.

The following letter, we presume, answers the information transmitted by Feitel to the plaintiff:

New Orleans, Juneml3th, 1907.

Mr. M. Feitel, City.

Dear Uncle, I have decided to let the matter drop in regard to letter written by you to the Wolverine Soap Co., defaming my character, and "For reasons best known to myself" I will not take action against you. Now, believe me, I am writing this letter without consulting any one, as I have now gone over my various routes and have vindicated myself with almost every one of my customers as to my sanity, which you know has handicapped me greatly, as I could bring you to hundreds of people who will testify that parties you have in your employ have spread this stigma around this City, that I was sent to an Insane Asylum, when, God Knows, I was suffering

from a nervous and melancholia disease, caused from dissipation and
and worriment over capital to handle a business of which I have made
a wonderful success, as my books will prove. Now, uncle, I will be
very thankful to you if you will send me an itemized account of what
I owe you, as I wish to pay my debts. I do not want my people to go
around saying I owe you money. Trusting you will send me my bill by
return mail, I am

Your. nephew

"Signed" Ike Samuels"

E. Samuels, a co-surety with Mc Mahon, and a brother of Ike Samuels,
swears that Ike Samuels was in a sanitarium prior to 1907 and afterwards; and
that he died in the City Mental hospital in 1909: he was over in Biloxi in
Dr. Tokes' Hospital for nervous people; he "would not like to see Mr. Mc Mahon
stuck for something he is innocent of"; in that way he has an interest in the
suit.

The plaintiff took the testimony of C. E. Mc Carthy, a cotton broker.
He testified that he had lived in New Orleans from August 1904 to 1913; that
he knew Ike Samuels very well; that he, witness, boarded at 6030 Garfield Street;
that from 1911 until 1913, Ike Samuels lived with them; he did not think he
was mentally unbalanced; he was peculiar, but not mentally unbalanced; he died
July 6th, 1913 about two weeks before his death, he had a sunstroke; it was
very hot, and jumping in and out of his wagon, he was overcome with the heat
and after that he acted very peculiarly.

The plaintiff also introduced in evidence an itemized statement of charges
and credits in the account of the Wolverine Soap Co. with Ike Samuels from
June 5th, 1907 to June 27th, 1913 showing from month to month, and sometimes
from week to week, the value of goods shipped to Samuels, and the sums remitted
by him to plaintiffs, also from month to month, and sometimes from week to
week, amounting, as previously stated, to $11,045.10 charged and $9,822.40 remitted.

They also offered in evidence an order for goods dated June 23d 1913,
in the handwriting of Ike Samuels and signed by him.

They also offered in evidence a report of Ike Samuels to the plaintiffs
dated June 21st 1913, in his handwriting, and signed by him, accusing an in-
debtedness of $1222.70.

In the presence of this testimony, we must conclude that the defense
of mental unsoundness has not been established. While Feitel writes to the

260

plaintiff that Ike Samuels was not in his right sound mind, Samuels' father, at the same period of time, writes to the plaintiff that he hopes they will continue to ship to his son soap on a small scale; and Feitel himself advances Samuels money and encourages him to trade with the plaintiffs. E,Samuels testifies that his brother was in a sanitatium, and yet he signs his bond with Mc Mahon; we cannot believe that he then considered his brother incapacitated from. doing business,as that would be accusing him of assisting his brother in bringing possible loss upon the plaintiffs and upon Mc Mahon. Besides, he was anxious that Mc Mahon should not be "stuck", even if by releasing him, the plaintiffs were "stuck".

Nor is it possible, if Samuels was of unsound mind, that he could have carried on his business during six consecutive years, receiving goods, distributing them along his routes, sending orders, making returns and remittances, without an interruption or an error at any time.

But be that as it may, there is no charge and no evidence, that the balance due by Ike Samuels was caused by reason of his unsound mind, and that the loss would not have occurred had he been of sound mind.

3o It was also urged in argument that the contract between the plaintiffs and Ike Samuels was void for want of mutuality, in that the plaintiffs bound themselves to ship goods to him, while he did not bind himself to take any -, and the case of Campbell vs. Lambert, 36,A., 35 is quoted as authority. That case is quite different from the one under consideration. The Lambert case was an attempt to recover damages for a violation of the contract; in this case the contract has been executed; Ike Samuels has received the goods and he must pay for them. Also 120 La., 966; 11 L. R. A. N. S. 717.

4o It was also urged in argument that Mc Mahon was not bound because the plaintiffs failed to notify him that at the time he signed as surety Ike Samuels was already indebted to them in the sum of $250 which was a concealment of a material circumstance.calculated to increase the risk of the surety, and that he was thereby discharged.

There are authorities to that effect. 32 Cyc 62; Stearns on Suretyship 15.154; 17 C. B. (N.S) 482; 2 K. B. (1912) 72; 10 Cl. 5 Fin , 934; H. of L. BK 8; 1 Dow 272. 292; Spencer on Suretyship 67 & 51; 8 Ch. Div. 475.

But we prefer to rest our conclusions upon what is said in Cyc on p. 63 (C):

"The creditor or obligee is not under a duty to disclose former trivial defaults of the principal, such as that he had failed to

account or to remit promptly, or that he had intermingled his funds with those of his employer, nor in the absence of inquiry is the creditor or obligee obliged to divulge the indebtedness of his principal, or that a judgment has been obtained against him, or that he is insolvent". *92 U. S. 93 -*

In this case the plaintiffs had sold goods to Ike Samuels; he was to pay for them "by remitting to the Company each week one half of the cash produced by his business". Samuels failed to do this on some occasions, but there was no active fraud in the omission; it was merely the passive neglect of a duty. It would be difficult to draw the line if this court should decide that in order to hold a surety the creditor must have informed him of every circumstance which might increase his risk, or of the reason which moved him to demand surety -; "the very fact that security is called for should make the surety alert". p 64. *32 Cyc*

5o The last defense urged is that the plaintiffs failed to notify the surety that Ike Samuels had failed to make weekly remittances to the plaintiffs as he was bound to do under his contract. The defendant relies upon the following cases: 68 N. W., 33; 71 N. W., 709; 113 Ill., 390; 81 Ky., 540; 35 Nova Scotia, 94.

But the tendency of our Supreme Court has been to hold sureties liable unless clearly discharged by some provision of the law.

In Dougherty vs Peters, 2 R., 534, a suit against a defaulting sheriff, the defendant contended he was discharged because the "plaintiff had not given the sureties due notice of the default". The Court disregarded the defense.

In the case of the La. State Bank vs Ledoux, 3 A., 675, the surety of a defaulting clerk resisted payment upon the ground that the officers of the Bank had failed to perform the duties imposed upon them by the By-laws of the Bank in the following particulars: 1o they required the cashier daily to examine the settlement of the cash accounts of the Bank; 2o that the Directors should visit monthly the vault in which the cash was deposited and to make an inventory of the same; and 3o that the books of the Bank should be balanced semi-annually; all of which had not been done. The surety argued that if the officers had performed their duty, the defalcations would not have been possible. The Supreme Court answered, that the By-laws were directory to the officers of the Bank and formed no part of the contract with the surety; that the surety had guaranteed that the Clerk would perform his duty and that it was not a condition of the bond that the officers of the Bank would

perform theirs; quoting Angel & Ames on Corporations Ch. IX p 517 6 3.

In the case of Ledoux vs. Jona, 30 A., 529, the court rejected the defense of a surety on a lease that "the lessor never notified him of the abandonment of the premises" by the lessee.

In the case of Mayor vs Redmond, 28 A., 275, a suit against a defaulting tax-collector, the Court said:

"Assuming as defendants contend, that plaintiffs were guilty of laches in not requiring the collector to make monthly reports as he was in duty bound by an ordinance of the council, it would not discharge the sureties".

*also—*
*6 La 578*
*7 A 118-*
*377*

In Board vs Brown , 33 A., 383 the Court said on p. 386:

"Defendant urges tha t the failure to require regular accounts from the Treasurer and regular settlements of these accounts, operated as a discharge of the sureties. We can find no merit in this defense". *See also 16 N.H.189- 36 Atl 437*

In 2 A., 188 and 18 A., 652, the surety was held liable for several months' rent, although the lessor had allowed the rent to accrue without notifying the surety. See Also 29 A., 841.

In Union Bank vs Beattie, 10 A., 578, the Supreme Court adopted the opinion of Troplong and said:

"In the absence of any previous communication between the creditor and the surety, the creditor binds himself to nothing."

Judgment affirmed.

April 5th, 1920.

May 31st, 1920.

264

## ON REHEARING.

The bond sued on is dated December 5th, 1907; the balance due by the defendant, according to the detailed account, is $1222.70; it extends from June 5th, 1907 to June 27th, 1913. According to this account, it appears that up to December 2nd, 1907 the plaintiffs had sold to the defendant, Samuels, goods amounting to $552.18, on account of which the defendant had remitted to the plaintiffs $321.55, leaving a balance due by ~~the defendant~~ *Samuels* to the plaintiffs, on December 2nd, 1907 of $230.63. This amount of $230.63 is included in the balance of $1222.70 claimed by plaintiffs from defendant. In his application for a rehearing, the defendant surety, McMahon, calls our attention to the error in the judgment holding him liable for sales made to Samuels at a time anterior to the date of his signing the bond. We think he is right, and that our judgment in that particular is erroneous. There is nothing in the bond from which it could be inferred that it was intended to cover past indebtedness by Samuels to the plaintiffs. The presumption therefore is that it was to apply only to future sales by plaintiff to Samuel. C. C., 3039 (3008) :

> "Suretyship cannot be presumed; it ought to be expressed, and is to be restrained within the limits intended by the contract"
>
> "One who seeks to make another liable for the debt of a third person, must prove such liability beyond all doubt or he cannot recover". 2 H. D., 1530, No. 1.
>
> "The surety in a sequestration bond cannot be made responsible for any injury to the property sequestered prior to the date of the bond". 7 R., 13.

Suretyship is of strict law and cannot inure or extend from one thing to another thing, from one person to another person, nor from one time to another time. 3 A., 255, 256.

"The rule is well settled that the contract of suretyship is not to be extended to any other subject, to any other person, or to any other period of time, than is expressed or necessarily included in it". 9 A., 403.

Sureties for the fidelity of an officer appointed for a limited term are not liable for his defaults beyond the term of the appointment or commission under which the bond was furnished. 40 A., 241; 48 A., 251; Trolong Caution § 155.

"But the contract of a surety is not retroactive and no liability attaches for defaults occurring before it is entered into, unless an intent to be so liable is indicated". 32 Cyc p 74 — *27 A. + E. E. L p 442 (b) 452 (b) ·537*

"Nor does an undertaking that the principal will pay for goods to be furnished cover goods already on hand". id p 110.

"Usually an undertaking as to future indebtedness does not cover indebtedness already existing". id p 118.

"The contract of guaranty and suretyship is not retroactive and the guarantor or surety cannot be held liable for anything occurring prior to the delivery of his contract unless the contract so stipulates". 5 Elliott on Contracts p 19 § 3944.

It is evident, therefore, that the defendant is not liable for this amount of $230.63 as surety.

It is therefore ordered that the judgment herein previously rendered, as far P. J. McMahon is concerned, be reduced from One Thousand, Two Hundred and Twenty-two 70/100 Dollars, to Nine Hundred and Ninety-two 7/100 Dollars, and as thus amended that it be affirmed, the plaintiff, appellee, to pay the costs of appeal.

May 31st, 1920.